Estate of Thomas J. O'Brien, Deceased, Julia Pinckney Keating O'Brien, Executrix, and Julia P. O'Brien v. Commissioner.
Estate of O'Brien v. Commissioner
Docket No. 83872.
United States Tax Court
T.C. Memo 1962-169; 1962 Tax Ct. Memo LEXIS 139; 21 T.C.M. (CCH) 944; T.C.M. (RIA) 62169; July 18, 1962
Julia P. O'Brien, 115 E. Gordon St., Savannah, Ga., for the petitioners. Donald C. Knickerbocker, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined the following deficiencies in income tax for the years indicated: Year
Deficiency
1956
$ 493.19
1957
1,440.88
The only issue remaining before us is whether amounts received by the decedent during the years in issue, for periods when he was absent from work due to injuries, are salary, excludable from his gross income (to the extent of $100 per week) under section 105(d). [1]
Thomas J. O'Brien (hereinafter referred to as O'Brien) died April 15, 1960, when *140 he was 64 years old, and his estate has been substituted as a party herein. His wife (hereinafter referred to as Julia) is the executrix of his estate; she is individually involved herein solely by reason of having filed joint returns with him for the years in issue. He and Julia filed their Federal income tax returns for the years in issue with the district director of internal revenue, Atlanta, Georgia. Said returns were filed on the calendar year basis. O'Brien was a certified public accountant. He commenced practice of his profession on his own in Savannah, Georgia, about 1920. Sometime during the 1940's he formed a partnership with Thomas R. Spillane in Savannah and began operations under the firm name "O'Brien and Spillane." Prior to July 1, 1956, W. D. Rhoads was admitted as a partner of the firm and after July 1, 1956, C. S. Lebey, Jr., was admitted as a partner. Spillane, Rhoads and Lebey all came into the partnership without initial capital investments. Sometime after July 1, 1957, the firm name was enlarged to "O'Brien, Spillane, Rhoads and Lebey." The partnership filed its Federal income tax returns on a fiscal year basis ending June 30. The partnership always operated *141 under oral agreements, there being no written articles of partnership or contracts or memoranda of understandings between the partnership and its members. There were none but informal conferences between partners regarding partnershippartner relations and the frequency and times of these conferences are unknown. The partnership was always operated at a profit, and during the years at issue O'Brien withdrew totals of $20,828.66 in 1956 and $20,205.52 in 1957. He received $15,000 of these amounts in each of these years in semimonthly installments. O'Brien was injured in March 1956 and such injury caused his absence from work for 17 weeks during that year. During this absence he continued to receive his semimonthly payments. He returned to work later in 1956 but in December of that year he was severely injured in an automobile accident, which injuries caused him to be absent from work during the entire year 1957, and he never again resumed participation in partnership affairs. In 1957, he continued to receive the same semimonthly payments throughout the year. In their joint returns for 1956 and 1957 O'Brien and Julia designated the above $15,000 payments as wages or salary but *142 the partnerships' three returns which cover these 2 calendar years (one of which was signed by O'Brien for the partnership) show no salaries being paid to any partner, nor any withholdings thereon, but designate the entire amounts received by O'Brien as his shares of income and credits. Petitioners have excluded from gross income $100 per week of O'Brien's "salary" received during his absence from work (the exclusions total $1,700 in 1956 and $5,200 in 1957) on the theory these amounts are wagecontinuation payments excluded by section 105(d). [2]
Respondent has determined, inter alia, that the amounts paid to O'Brien during his absences from work were not wages or payments in lieu of wages, and since a resolution of this dispute adverse to petitioners *143 is dispositive of the entire case, we consider it first. It is clear from the language of section 105(d), supra, that if the amounts which O'Brien received semimonthly from the partnerships were simply advances against his anticipated shares of accruing net profits, that respondent's determinations must be sustained, and the burden of proving that such payments were guaranteed wages or salary or anything other than such distributive shares falls upon petitioners. , affd. , certiorari denied ; , affd. , certiorari denied . We have spent a great deal of time in searching the record in this case for all of the evidence bearing upon this vital issue and we note the following: In testifying for petitioners, Julia stated: Well, I can say this, Your Honor: That my husband sincerely and truly looked upon that payment of $15,000 a year made to him in semi-monthly amounts was truly a salary that he worked for, and that he deserved. * * * I think I have said it already, but I don't know *144 whether I have said it since I have been sworn: That their first understanding, Mr. O'Brien and Mr. Spillane, was in setting up the salary for each. And Thomas K. O'Brien, the son of O'Brien and Julia, testified: Well, the salaries we were talking about, they were bona fide partnership salaries. They were paid semi-monthly, as any other salaries, and as I see it, they were an attempt to compensate the partners, for the value of their services to the partnership. * * * The above are, of course, conclusory statements as to petitioners' position. Further testimony of Julia includes the following: Now the statement that each year they would - well, may I say, gather around and decide what was to be paid, - I don't know that that was true at all. I think it was the policy, rather, if a new partner was to be admitted to the firm, things would go along as they had been going, and I think at any time during the year they felt timely to increase a salary, that would be all right. I don't think there would be any argument there. But I don't think it was ever a set rule to have a meeting, you know, at the beginning of each fiscal year. * * *
As far as I know, there was never *145 any regular meeting at the beginning of each year, as to what amounts would be paid in salaries. If there were new partners, or if there were any partner to be admitted, I am sure that they had a meeting about that; and I don't think that it was necessary at the time of that meeting to decide whether, say, a junior partner's salary should be raised a bit; you know? I think it would have probably been quite all right almost any time, if it were considered timely, during the year. * * *
Q. Then your answer is Yes; that the control of business, or client; the production of business; did enter very markedly into the determination of the interest which each partner had in the firm and in its business. A. Well, I imagine that would be true. I know it was especially true of my husband. Q. It was true of your husband. A. Indeed, yes. I can't say, really, what Mr. Spillane and the other two did to - Q. Did your husband, or any of the other partners, have written contracts of employment with the partnership, and by the partnership? A. I have never heard of one. * * *
Q. Mrs. O'Brien, to your knowledge was there ever, during these years, or during years shortly before *146 the years in issue, or shortly after, when the partnership had an operating deficit at the end of the year? * * * A. I never heard of it. I am sure they never operated at a deficit. Q. Did your husband ever discuss such an eventuality with you? A. No, sir. After all, accountants are supposed to know what to do with their help, and if they are going to run into a deficit, it is very easy to place a good accountant. And Thomas K. O'Brien in further testimony stated: Q. Were you ever present at any of the discussions between partners at the starts of the partnership years which are involved in this proceeding, when your father and his partner or partners discussed the prospects and arrangements for the ensuing year? A. No; I was not. As a matter of fact, I am not so sure that there were any formal discussions. I mean, it was more the kind of a thing that so and so should be raised, and like that. I don't think there were ever any - I know later on there were formal meetings, but there were none - I don't believe there were any in these years. It was a very informal thing, and there would be some conversation when they thought a change was necessary, but I was not present in *147 the meetings in this period. Q. Were there ever any discussions at which you were present - A. Yes. Q. (Continuing) - when possible operating deficits were discussed, and the method in which they would be handled by the partners? A. No. The record shows that Thomas R. Spillane, W. D. Rhoads, and C. S. Lebey, Jr., O'Brien's partners during the years in issue, were still living and in Savannah, Georgia, at the time of the trial of this case in Atlanta, Georgia, but although Julia testified that they knew a good deal about the operation of the partnerships, they were not produced as witnesses. This is not noted in criticism of Julia, for we believe that she was entirely honest and sincere in her testimony and in her handling of this case, but with regret because it is possible that O'Brien's partners could have testified to facts to support the broad conclusions made by Julia and Thomas K. O'Brien. We do not doubt that O'Brien was paid $15,000 in each of the years in issue in semimonthly installments much as a salary would have been paid but we cannot conclude from this record that said amounts had been agreed upon by the partners as payable in any event and whether or not *148 net profits were adequate therefor. Considering the entire record, we conclude that petitioners have not overcome the presumptive correctness of respondent's determination that the amounts paid to O'Brien during his absences from work in 1956 and 1957 were not wages or payments in lieu of wages. It is therefore unnecessary to consider respondent's further contentions. Decision will be entered for the respondent. Footnotes
1. Unless otherwise noted, all Code references are to the Internal Revenue Code of 1954.↩
2. SEC. 105. AMOUNTS RECEIVED UNDER ACCIDENT AND HEALTH PLANS. (d) Wage Continuation Plans. - Gross income does not include amounts referred to in subsection (a) if such amounts constitute wages or payments in lieu of wages for a period during which the employee is absent from work on account of personal injuries or sickness; but this subsection shall not apply to the extent that such amounts exceed a weekly rate of $100. * * *↩